IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| WESTERN WORLD INS. CO., | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 2:05cv327-ID |
| | )           (WO) |
| RESURRECTION CATHOLIC MISSION | ) |
| OF THE SOUTH, INC., et al., | ) |
| | ) |
|      Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Before the court is a motion for summary judgment, filed by Plaintiff Western World Insurance Co. ("Western World").  (Doc. No. 33.)  A brief and an evidentiary submission accompany the motion.  (Doc. Nos. 34-35.)  Defendants Resurrection Catholic Mission of the South, Inc., ("Resurrection") and Allen E. Nichols ("Mr. Nichols") filed separate briefs in opposition, and Mr. Nichols attached an evidentiary submission.  (Doc. Nos. 41-43.)  Western World filed a reply.  (Doc. No. 46.)

This declaratory judgment action involves the interpretation of a commercial general liability policy issued to Resurrection, a skilled nursing facility, by Western World.  The parties' arguments focus primarily on the construction of two endorsements to the policy, namely the sexual action exclusion and sexual molestation insurance, and Western World asks the court to determine to what extent, if any, it is obligated to defend

and indemnify Resurrection in an underlying state court action.  After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that Western World's motion for summary judgment is due to be granted in part and denied in part, as set forth herein.

## II.  JURISDICTION AND VENUE

By its express terms, the Declaratory Judgment Act requires an independent ground for subject matter jurisdiction.  28 U.S.C. § 2201(a); see also First Federal Savings and Loan Ass'n of Lake Worth v. Brown, 707 F.2d 1217, 1220 (11th Cir. 1983). Here, the parties do not contest that this suit is between parties with diverse citizenship and that the amount in controversy exceeds $75,000.  Accordingly, the court finds that it may exercise subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity) and 28 U.S.C. § 2201 (Declaratory Judgment Act).  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations of both.

## III.  SUMMARY JUDGMENT STANDARD

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

2

matter of law." Fed. R. Civ. P. 56(c).  At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) (citations omitted).  This determination involves applying substantive law to the substantive facts that have been developed.  A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed.  See id. at 248; Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at 323.  The burden then shifts to the non-moving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.

## IV.  BACKGROUND

### A.  The Underlying State Court Lawsuit

Mr. Nichols filed a lawsuit in the Circuit Court of Autauga County on behalf of his then 90-year-old mother, Audrey L. Nichols ("Ms. Nichols"), against Resurrection and others, seeking recovery for injuries sustained by Ms. Nichols at the hands of Marion

3

Sheppard ("Sheppard"), one of Resurrection's employees.[1]  Resurrection is a skilled
nursing care facility located in Autauga County, Alabama.  Two of the other named
defendants in the state lawsuit are Kim Johnson ("Johnson") and Father Manuel Williams
("Williams"), who also are insureds under the policy at issue.  (3rd Am. Compl. ¶¶ 3-4.)
Johnson, at all pertinent times herein, was the administrator and/or director of nursing at
Resurrection, and Williams was the chief executive officer, manager and director of
Resurrection.  (Id.)

     The alleged facts in the Third Amended Complaint, which the parties agree is the
operative complaint for purposes of this declaratory judgment action, are relevant to
determining coverage.  The Third Amended Complaint alleges that Ms. Nichols was
admitted to the Resurrection facility for nursing home care on June 19, 2002.  (Id. ¶ 7.)
She was diagnosed as suffering from "hallucinations, depression, general anxiety
disorder, and Alzheimer's disease."  (Id.)

     On July 28, 2003, Sheppard, an LPN, submitted an application for employment
with Resurrection, and Johnson interviewed him.  (Id. ¶ 9.)  At the time, Resurrection had
in place a "Resident Abuse Policy," which provided that "[t]he facility will not hire a
potential employee with a history of abuse if that information is known to the facility."
(Id. ¶ 8.)  The policy also set forth Resurrection's standards regarding screening of

---

[1] In order to distinguish between the Nichols, the court refers to the father as "Mr.
Nichols" and the mother as "Ms. Nichols."

potential employees, identifying "events" or "trends" which may indicate abuse of its patients, and investigating alleged violations.  (Id.)

Sheppard disclosed on his application for employment that, while working in another nursing home, he had been accused of sexually abusing an 86-year-old female patient; he, however, elaborated on the application that, although indicted, his "case was dismissed . . . for lack of evidence."  (Id. ¶¶ 10, 13.)  Notwithstanding Sheppard's disclosure, Johnson hired Sheppard on July 29, 2003.  (Id.)

Sheppard was assigned to work the shift commencing at 3:00 p.m. and ending at 11:00 p.m.  Sheppard's time sheets, however, revealed that he "consistently remained at the facility of Resurrection . . . after his shift had ended."  (Id. ¶ 13.)  Although Sheppard was reprimanded for remaining on the premises after the conclusion of his shift, he continued to do so.  (Id.)

The Third Amended Complaint further alleges that, during the early morning hours of October 9, 2003, Ms. Nichols "was physically abused, and/or sexually molested, and/or beaten and/or attacked in some manner," the specifics of which are unknown.  (Id. ¶ 22.)  That morning, a Resurrection employee discovered Ms. Nichols lying in her bed with sheets "covered with blood," "skin tears," "vaginal tears," "black eyes" and "bruises on her body," including her arms and legs.  (Id. ¶¶ 25, 142(2); (see also id. ¶ 24.)  Sheppard is the suspected perpetrator.  Notwithstanding these injuries, Ms. Nichols was not provided "medical care and attention . . . for an excessive period of time."  (Id. ¶ 25.)

The Third Amended Complaint sets forth thirty-nine state law counts.  Twenty of the claims are lodged against Resurrection.  The causes of actions against Resurrection are varied and consist of the following:  Breach of Alabama Medical Liability Act (Counts 1 and 2); negligent, hiring, training, supervision, retention, placement and investigation (Counts 4-7, 34-35); tort of outrage (Counts 8-9); breach of contract (Counts 10-11); fraudulent suppression (Counts 12-13); detention (Counts 14-15); false imprisonment (Counts 16-17); and assault and battery (Counts 18-19).

B.  The Policy

Western World insured Resurrection under a commercial general liability insurance policy, policy number NPP755734, affording coverage for liability in accordance with the terms and conditions stated therein.[2]  It is undisputed that the policy was in full force and effect when the acts which form the basis of the underlying state court complaint were committed.  (See 3rd Am. Compl. ¶ 8.)

There are several provisions of the policy that are relevant in this litigation.  The subject policy provided, inter alia, the following coverages:

1. Coverage A - Bodily Injury and Property Damage Liability (Policy, Ex. B to Doc. No. 35at 43);

---

[2] Resurrection is the named insured.  Although Mr. Nichols has argued coverage issues as to Johnson and Williams, who also are insureds under the policy, they are not parties to this litigation.  This opinion, thus, is limited to a discussion of Western World and Resurrection's relative rights under the policy.

2. Coverage B - Personal and Advertising Injury (id. at 47);

3. Coverage D - Professional Liability (id. at 9); and

4. Coverage E - Sexual Molestation Insurance (id. at 14)

The subject policy also contains an endorsement titled "Sexual Action Exclusion"

(id. at 22), which provides as follows:

### SEXUAL ACTION EXCLUSION

This endorsement modifies such insurance as is afforded by the provisions of the policy related to the following:

> Commercial General Liability Insurance - Coverage A & B
> Professional Liability Insurance - Coverage D
> Hospital Professional Liability Insurance
> Owners' and Contractors Protective Liability Insurance

It is agreed that no coverage exists for claims or suits brought against any insured for damages arising from sexual action.

Sexual action includes, but is not limited to, any behavior with sexual connotation or purpose - whether performed for sexual gratification, discrimination, intimidation, coercion or other reason.

It is further agreed that this exclusion applies even if an alleged cause of the damages was the insured's negligent hiring, placement, training, supervision, act, error or omission.

(Policy at 22 (Ex. to Doc. No. 35).)

Also relevant to this lawsuit is Coverage E, titled, "Sexual Molestation Insurance,"

which is part of Resurrection's policy by way of another endorsement.  (Policy at 14-15

(Ex. to Doc. No. 34).)  This insurance applies to acts of "sexual molestation," which is

defined as "any action with sexual connotation or purpose resulting in bodily injury or

7

mental injury." (Id.)  The Limits of Insurance section provides coverage in the amount of $100,000 for "each claim or suit for damages due to 'molestation'" and $300,000 in the aggregate.  (Id.)  The $300,000 aggregate is the "most [Western World] will pay because of all damages due to 'molestation.'"  (Id.)

## C.  The Instant Lawsuit

On April 8, 2005, Western World commenced this declaratory judgment action against Resurrection, Mr. Nichols (as conservator of Ms. Nichols and individually), and Johnson.[3]  Western World currently is defending Resurrection in the underlying lawsuit under a reservation of rights.  (Compl. ¶ 10 (Doc. No. 1).)  In its complaint, Western World alleges that there is no duty to defend or indemnify Resurrection under Coverages A, B, and D, above, for the claims and allegations asserted in the underlying complaint by application of the sexual action exclusion and that coverage is governed by the lower limits of liability set forth in the sexual molestation insurance.  (Id. ¶ 11.)  Pursuant to the sexual molestation insurance, Western World alleges that the maximum amount payable in benefits to Resurrection by virtue of the lawsuit filed against it in state court, regardless of the number of insureds sued in that underlying complaint, is $100,000.  (Id. ¶ 12.)

---

[3] Upon motion of the parties, the court dismissed without prejudice all claims against Johnson.  (See Doc. Nos. 18, 19.)  Johnson, however, stipulated that any coverage decision reached by the court in this litigation would be binding on her.  (See Doc. No. 18 Ex. A.)

The instant motion for summary judgment followed.  Therein, Western World seeks an entry of summary judgment in its favor, declaring that, by virtue of the sexual action exclusion in the subject policy, insurance coverage "is not afforded" Resurrection under Coverages A, B and D of said policy for all claims asserted against Resurrection in the underlying state court action which seek relief for injuries suffered by Ms. Nichols, one of Resurrections' patients, on October 9, 2003.  As a result, Western World contends that coverage is limited to that provided by the sexual molestation insurance, and, in this regard, also seeks an entry of summary judgment in its favor, declaring that the policy limit under this endorsement is $100,000, "regardless of the number of insureds sued in the underlying complaint, subject to a $300,000 aggregate policy limit."  (Doc. No. 33 at 2.)

## V.  DISCUSSION

### A.  General Principles of Law:  Contract Interpretation

_____This case involves Western World's duty to defend and duty to indemnify Resurrection in the underlying state court action.  To determine whether Western World must defend and/or indemnify Resurrection in the underlying state court action, the court must examine the language of the insurance policy and interpret its terms according to principles of insurance contract construction.  Because jurisdiction in this case arises from diversity of citizenship, 28 U.S.C. § 1332, the court applies the forum state's choice of law rules.  The parties do not dispute that Alabama courts would apply Alabama

substantive law to this dispute, and this court agrees; thus, Alabama rules of contract interpretation govern.  See Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc., 420 F.3d 1317, 1326 n.5 (11th Cir. 2005).

"It is well settled 'that [an] insurer's duty to defend is more extensive than its duty to [indemnify].'"  Tanner v. State Farm Fire & Cas. Co., 874 So.2d 1058 (Ala. 2003) (quoting United States Fid. & Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala. 1985)).  An insurance company's duty to defend its insured is determined primarily by the allegations in the complaint giving rise to the action against the insured.  See id.; Ajdarodini v. State Auto Mutual Ins. Co., 628 So.2d 312, 313 (Ala. 1993); Sphere Drake Ins. PLC v. Shoney's, 923 F. Supp. 1481 (M.D. Ala. 1996).  "If the allegations of the injured party's complaint show an accident or occurrence which comes within the coverage of the policy, the insurer is obligated to defend regardless of the ultimate liability of the insured."  Chandler v. Alabama Mun. Ins. Co., 585 So.2d 1365, 1367 (Ala. 1991) (citation omitted); see also Blackburn v. Fidelity and Deposit Co. of Maryland, 667 So.2d 661, 668 (Ala. 1995) ("The insurer's duty to defend is determined by the allegations of the complaint against the insured, whether true or groundless, and if there is any uncertainty as to whether the complaint alleges facts that would invoke the duty to defend, the insurer must investigate the facts surrounding the incident that gave rise to the complaint in order to determine whether it has a duty to defend the insured.").  On the other hand, where the complaint fails "on its facts" to allege a covered occurrence, the court is not bound exclusively by the allegations in the complaint, but may examine

10

"'facts which may be proved by admissible evidence.'"  Tanner, 874 So.2d at 1064

(quoting Pacific Indemnity Co. v. Run-A-Ford Co., 161 So.2d 789 (1964)).

However, an insurer does not have a duty to defend or indemnify when the

complaint shows either the non-existence of coverage or the applicability of a policy

exclusion.  See Alfa Specialty Ins. Co. v. Jennings, 906 So.2d 195 (Ala. Civ. App. 2005).

Where an insurer seeks to avoid coverage based upon an exclusion, the insurer bears the

burden of establishing that the exclusion applies.  Universal Underwriters Ins. Co. v.

Stokes Chevrolet, 990 F.2d 598, 605 (11th Cir. 1993).  Conversely, under Alabama law,

the insured bears the burden of establishing coverage by demonstrating that a claim falls

within the policy.  Colonial Life and Accident Ins. Co. v. Collins, 194 So.2d 532, 535

(Ala. 1967).

Whether an insurance company has duty to indemnify is subject to a different

standard than that which governs the duty to defend:  "Although the bare allegations of

the complaint may trigger an insurer's duty to defend its insureds, '[t]he duty to pay . . .

must be analyzed separately.'"  Porterfield v. Audubon Indem. Co., 856 So.2d 789, 792

(Ala. 2002) (quoting United States Fid. & Guar. Co. v. Armstrong, 479 So.2d 1164, 1167

(Ala. 1985)).  "The insured's conduct rather than the allegedly injured person's allegations

determine whether the insurer has a duty to indemnify."  Id. (quoting City Realty, Inc. v.

Continental Cas. Co., 623 So.2d 1039, 1047 (Ala. 1993)).

If an insurance policy is ambiguous in its terms, the policy must be construed

liberally in favor of the insured, and exceptions to the coverage must be interpreted as

narrowly as possible in order to provide the maximum coverage to the insured.  Altiere v. Blue Cross and Blue Shield, 551 So.2d 290, 292 (Ala. 1989).  On the other hand, "it is imperative that courts enforce unambiguous policies as written."  Carpet Installation & Supplies of Glenco v. Alfa Mut. Ins. Co., 628 So.2d 560, 562 (Ala. 1993); see also Auto-Owners Ins. Co. v. Am. Cent. Ins. Co., 739 So.2d 1078, 1081 (Ala. 1999).

The determination of whether a policy term is ambiguous is a question of law.  Id. The court, however, should give policy provisions the "same meaning 'that a person of ordinary intelligence would reasonably give it.'"  Id. (quoting Western World Ins. Co. v. City of Tuscumbia, 612 So.2d 1159, 1161 (Ala. 1992)); see also McKissick v. Auto-Owners Ins. Co., 429 So.2d 1030, 1033 (Ala.1983) ("provisions of insurance policies must be construed in light of the interpretation that ordinary [people] would place on the language used").  "This means that the terms of an insurance policy should be given a rational and practical construction."  Am. Resources Ins. Co. v. H & H Stephens Const., Inc., ___ So.2d ___, 2006 WL 749992, *4 (Ala. 2006).

B.  The Sexual Action Exclusion

1.  Arguments of the Parties

For purposes of the instant motion, Western World has proceeded under the assumption that the claims asserted in the underlying Third Amended Complaint fall within Coverages A, B or D of the policy.  (Doc. No. 34 at 4.)  The court shall do the same.  Western World, however, contends that, "[e]ven with this assumption, coverage is

12

excluded" by virtue of the policy's sexual action exclusion. (Id.); see Royal Ins. Co. of Am. v. Thomas, 879 So.2d 1144, 1149 (Ala. 2003) ("An exclusion in an insurance policy is a provision that eliminates coverage that would have existed in the absence of the exclusion."). Namely, Western World asserts that the sexual action exclusion is "clear and unambiguous" and bars coverage under Coverages A, B and D for all claims asserted against Resurrection in the underlying state court complaint. (Doc. No. 34 at 4.) Focusing on the "arising from" language in the sexual action exclusion, Western World contends that "[a]ll of the theories of liability asserted in the underlying complaint clearly arise from the alleged sexual molestation of [Ms.] Nichols by Sheppard and, thus, are excluded from coverage under Coverages A, B and D." (Id.) Thus, Western World asserts that the sexual action exclusion "operates to bar coverage" for Coverages A, B and D, "regardless of the specific theory of liability asserted by the underlying plaintiff." (Id.)

Mr. Nichols effectively concedes that the sexual action exclusion bars coverage for Counts 15, 17 and 19, which assert causes of action against Resurrection for detention, false imprisonment, and assault and battery.[4] (Doc. No. 42 at 52.) As to remainder of the counts in the underlying state court complaint against Resurrection, Mr. Nichols divides them into two groups -- those counts against Resurrection which he admits arise from sexual action and those counts against Resurrection which he says are unrelated to sexual

---

[4] These three counts aver that, as a result of Resurrection's alleged detention and false imprisonment of Ms. Nichols on October 9, 2003, as well as Resurrection's negligence, Ms. Nichols "was sexually assaulted and received a vaginal tear or tears as a result of th[e] assault." (3rd Am. Compl. ¶¶ 45, 48, 50 (Ex. to Doc. No. 35).)

13

action.  (Id. at 24).  As to the first group, the counts which are predicated upon "sexual action" (i.e., Counts 2, 5, 7, 9, 11, 13 and 35), Mr. Nichols concedes that coverage is not afforded under Coverages A and B, but contends that Coverage D provides coverage, regardless of the existence of the sexual action exclusion.  (Id. at 44-56.)  As to the second group of counts, Mr. Nichols argues that the sexual action exclusion does not exclude coverage under Coverages A, B and D because these counts "hav[e] nothing to do with sexual action."  (Id. at 25.)  Mr. Nichols contends that the latter counts consist of the following:  Counts 1, 4, 6, 8, 10, 12, 14, 16, 18 and 34.  (Id. at 29-37, 42.)  Mr. Nichols emphasizes that the prayer for relief for each of these counts does not seek relief for "sexual abuse or molestation."  (See, e.g., id. at 30.)

Resurrection, in a more brief fashion, argues that, at this juncture, the facts are not conclusive as to whether or not Sheppard's "primary purpose was to assault Ms. Nichols" or "to sexually abuse her" and that, without ascertaining Sheppard's purpose, the court cannot determine on this record as a matter of law that all of the claims "arise from" the sexual assault.  (Doc. No. 41 at 1.)

### 2.  Is the Sexual Action Exclusion Unambiguous?

As  a threshold determination, the court must examine the language of the sexual action exclusion in its entirety and in relation to the terms of the contract as a whole, to ascertain whether it is unambiguous.  The meaning of "sexual action," as set forth in the exclusion, "includes, but is not limited to, any behavior with sexual connotation or

14

purpose -- whether performed for sexual gratification, discrimination, intimidation, coercion or other reason."  (Policy at 22 (Ex. to Doc. No. 35).)  The exclusion also "applies even if an alleged cause of the damages was the insured's negligent hiring, placement, training, supervision, act, error or omission."  (Id.)

Although the parties have not cited, and the court has not found, any published opinion from an Alabama court interpreting an identical or similar sexual action, at least two other courts in surrounding jurisdictions have found the identical sexual action exclusion to be unambiguous, and the court found no authority interpreting such an exclusion in another manner.[5]  See Western World Ins. v. Country Place Adolescent Residential Treatment, 211 F.3d 125 (Table), No. 99-11007 (5th Cir. March 8, 2000); Western World Ins. Co., Inc. v. Branch, 965 S.W.2d 760, 761 (Ark. 1998).  The court likewise finds that the language of the exclusion is not ambiguous.  The court, thus, finds that it must enforce it as written, according to its plain meaning without resorting to the rules of construction.  See North River Ins. Co. v. Bailey, 133 F.3d 363, 370 (5th Cir. 1998).

_____

[5] The court notes that the absence of authority from the Alabama courts does not free this court from having to decide the issues presented concerning Western World's duty to defend and to indemnify Resurrection.  See Guideone, 420 F.3d at 1326 n.5 (noting that, even though the Florida courts had not "spoken definitively" on the meaning of "arising out of sexual misconduct," as used in a commercial general liability policy's sexual misconduct exclusion, it was not "absolve[d]" of its "duty to decide what the state courts would hold if faced with it").  The court, thus, strives to resolve this issues presented "in a manner consistent with established general precepts of policy construction in place in the State of [Alabama]."  Id. at 1326.

### 3.   "Sexual Action"

Having found the sexual action exclusion unambiguous, the court turns to the meaning of "sexual action" in relation to the acts alleged in the underlying state court complaint.  In Bailey, the Fifth Circuit, applying Texas law, had the opportunity to examine and interpret an identical sexual action exclusion clause as the one at issue here and found its parameters to be, not only unambiguous, but also far-reaching in scope. The Fifth Circuit held that "[t]he exclusion establishes very broad parameters for acts that fall within its compass by using the words, '[s]exual action includes, but is not limited to.'"  133 F.3d at 370.  The court agrees with Bailey, as the exclusion encompasses "*any* behavior with sexual connotation or purpose," and, while examples are enumerated, the definition of "sexual action" is not limited to those illustrations.  The expansive terms of the exclusion cover virtually any conduct, so long as there is a sexual purpose or connotation to the behavior, regardless of the theory of recovery alleged.  Indeed, the exclusion contemplates the potentiality for causes of action predicated on negligence.

There can be no question but that the actual rape, evidenced by the "vaginal tears" suffered by Ms. Nichols, unambiguously constitutes "sexual action" within the definition set forth in the policy; indeed, there has been no argument to the contrary.  The court, thus, finds that the rape falls within the parameters of the sexual action exclusion.  See Guideone, 420 F.3d at 1327 ("sexual misconduct exclusion" in policy unambiguously barred coverage for rape of victim); Bailey, 133 F.3d at 370 (applying Texas law to a Western World policy, with an identical exclusion, and holding that minister's sexual

16

misconduct unambiguously fell within exclusion for "sexual action").  It necessarily follows that all the claims in the underlying state court complaint which are predicated on the actual rape are barred from coverage pursuant to the sexual action exclusion and that coverage thereby is limited to that afforded to "molestation" under the sexual molestation insurance endorsement.  (See Policy at 14 (Ex. to Doc. No. 35).)  These counts, as conceded by Mr. Nichols, are Counts 2, 5, 7, 9, 11, 13, 15, 17, 19 and 35 of the underlying third amended complaint.[6]  (See Doc. No. 42 at 44-56.)

As discussed below, however, the court finds that the claims based on damages allegedly caused by the physical battering of other parts of Nichols' body (namely, her arms, legs and eyes) are not "sexual action" in and of themselves.  Rather, as explained below, the court finds that it must give consideration to whether these damages "arise from" the actual act of the rape.  At this juncture, the court's analysis diverges from the analysis of Western World, as Western World's arguments are premised on a factual assumption that all of the injuries suffered by Ms. Nichols in the early morning hours of October 9, 2003, arose solely from sexual action.  For the reasons set out below, the court finds that the facts alleged in the third amended complaint do not allow the court to make this factual assumption.

---

[6] The court rejects Mr. Nichols' alternative argument that Coverage D provides coverage for Counts 2, 5, 7, 9, 11, 13 and 35, because the alleged perpetrator is an "employee" of the insured.  The court finds that the argument is meritless and warrants no discussion herein.  The court concurs with the sound reasoning of Western World on this issue.  (See, e.g., Doc. No. 46 at 6-8.)

### 4.  *"Arising From"*

In addition to the actual rape injuries (i.e., the vaginal tears), the court recognizes, as emphasized by Resurrection, that Ms. Nichols also exhibited "bruises" and/or cuts on body parts other than her vagina, such as her eyes, arms and legs.  (See, e.g., 3rd Am. Compl. ¶¶ 25, 142(2).)  The issue is whether these damages "arise out of" of the rape. For the reasons to follow, the court finds that the answer is uncertain at this point.

Although again the court did not find a published opinion by an Alabama court which defined the meaning of "arising out of" or "arising from" in the context of insurance policies, every opinion which the court uncovered from other jurisdictions has interpreted the phrase broadly.  In Western World Ins. v. Country Place Adolescent Residential Treatment Center, the Fifth Circuit elaborated on the meaning of "arising from" in interpreting the same sexual action exclusion at issue here:

> The exclusion precludes coverage for damages claims against the insured "arising from" sexual action.  When used in an insurance policy, these words have a broad meaning.  They mean "originating from," "growing out of," or "flowing from," and require only that a claim bear an "'incidental relationship' to the excluded injury for the policy's exclusion to apply."

211 F.3d 125 (Table) (5th Cir. 2000) (internal citation omitted).  Also, in Bailey, the Fifth Circuit concluded that the words "arising out of" are "'broad, general, and comprehensive terms effecting broad coverage,'" and that "[t]he words are 'understood to mean originating from, having its origin in, growing out of or flowing from.'"  133 F.3d at 370 & n.7 (noting that "the term 'arising out of' is indistinguishable from the term 'arising from'"); Continental Cas. Co. v. City of Richmond, 763 F.2d 1076, 1080-81 (9th Cir.

1985) ("arising from," when used in an insurance policy, need only have an "incidental relationship" to the excluded injury for the policy's exclusion to apply); <u>Tuscarora Wayne Mut. Ins. Co. v. Kadlubosky</u>, 889 A.2d 557, 563 (Pa. Super. 2005) ("construed strictly against the insurer, 'arising out of' [in a policy] means causally connected with, not proximately caused by"); <u>Metropolitan Prop. & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co.</u>, 793 N.E.2d 1252, 1255 (Mass. App. Ct. 2003) (holding that the phrase "arising out of," when used in insurance contracts is "not to be construed narrowly but . . . read expansively," and means "'originating from, growing out of, flowing from, incident to or having connection with'").

The court finds particularly helpful the Eleventh Circuit's decision in <u>Guideone</u>, *supra*, involving the court's prediction of Florida law on an issue of first impression. The court, thus, recites the facts and holding of this opinion in some detail.

In <u>Guideone</u>, a mother who was picking up her child from a church preschool program, was attacked and abducted in the church parking lot. Her two children were in the vehicle. <u>See</u> 420 F.3d at 1320-21. During the course of the abduction, which began at noon and ended on the same day,[7] the abductor at one point stopped the car and raped the victim in a grassy area; at separate times, once before the rape and once after, the abductor forced the victim to perform oral sex on him while he was driving. During the first incident of oral sex, the abductor struck the victim in the back of the head because

_____

[7] The precise timeframe, in terms of hours or minutes, is not stated.

the children were yelling, preventing him from ejaculating.  See id. at 1321.  In addition

to the sexual molestation of the victim, the abductor also hit the victim's daughter,

threatened to kill the victim and her children with a knife, and robbed the victim.  See id.

at 1320-22.

During the relevant time period, the church was covered by a primary liability

insurance policy which contained a sexual misconduct exclusion.  The sexual misconduct

exclusion barred coverage for injuries "arising out of or resulting from any actual or

alleged act of sexual misconduct of any kind."  Id. at 1322.  The insurer filed an

anticipatory declaratory judgment, seeking a determination of coverage under the sexual

misconduct exclusion.  See id. at 1323.  A state court lawsuit followed in which the

church was sued by the victim and her children for monetary damages for the kidnapping

which commenced on church property, the assaults and batteries which ensued, and

negligence in failing to provide adequate security.  See id.  The insurer denied coverage,

concluding that the abductor's intent was sexual.  See id.  The district court resolved the

matter in favor of no coverage.  It concluded that the abductor's "non-sexual acts were

incidental to and arose from his sexual acts," and that, therefore, "*all* of the underlying

criminal acts of the perpetrator amounted to 'sexual misconduct.'"  Id. at 1326.  The

Eleventh Circuit disagreed and framed the "primary issue" as "whether allegations of the

Incident in the underlying State Action against the Church constitute acts 'arising out of

sexual misconduct' within the meaning of the CGL, such that they trigger the Sexual

Misconduct Exclusion of the Policy."  See id.

20

Predicting Florida law, the Eleventh Circuit held that "sexual misconduct," even though not defined in the policy, had "a single clearly defined meaning" and that the rape clearly and "unambiguously" fell within the sexual misconduct exclusion.  Id. at 1327. The Eleventh Circuit then observed that Florida courts interpreted "arising out of" as "broader in meaning than the term 'caused by' and mean 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to,' or 'having connection with.'"  Id. at 1327 (citation omitted).  The court found the "arising from" language, and the exclusion as a whole, to be unambiguous.  See id.  The Eleventh Circuit held that, akin to the "but for" causation test, the exclusion should be examined to ascertain "'whether there would have been personal injuries, and a basis for the plaintiff's suit, in the absence of the objectionable underlying conduct.'"  Id.

Having found the rape to constitute "sexual conduct," the Eleventh Circuit set out to determine whether any of the non-sexual acts of the abductor, such as the physical assaults and kidnapping, arose out of the sexual acts.  See id.  It answered in the negative. Id.  The court concluded that it could not say that the non-sexual acts, which included the hit on the head the victim suffered during the course of performing forced oral sex on the abductor,

> were "connected" to the sexual acts such that the non-sexual acts would not have occurred "but for" the sexual misconduct.  It is completely plausible that the Victim and her children could have been assaulted, kidnapped, battered, held at knife-point, falsely imprisoned, and robbed, without the Victim having been raped, and have suffered the same or similar physical and mental injuries.

In our view, injuries "arising out of" an act of sexual misconduct can be distinguishable from injuries related to the non-sexual acts of the perpetrator.  For instance, non-covered injuries could include any sexually-transmitted diseases, genital bruising, or any emotional trauma, subsequent sexual dysfunction, or loss of consortium resulting solely from the rape portion of the Incident.  All of these constitute injuries emanating from acts of sexual misconduct.  We find it difficult to categorize a multi-crime episode, which included a kidnapping, an assault and battery, and a robbery, as simply incident to a rape.  The Incident commenced with a kidnapping and battery of not only the Victim, but also her children, who played no part in any of the sexual acts.  While the rape certainly punctuates the Incident, it was but one of the many traumatizing events to have occurred to the Victim and her family.

Id.

The court rejected the argument that the sexual and non-sexual acts were "inseparably intertwined."  Id. at 1329.  The Eleventh Circuit reasoned that "the Victim's injuries from assaults and batteries occurring during the course of sexual acts may or may not be intertwined with the sexual misconduct, depending upon the perpetrator's purpose."  Id.  However, non-sexual acts (the assaults, batteries, kidnapping, false imprisonment) occurring independent of the sexual acts, i.e., during the robbery, are not inseparably intertwined with the sexual misconduct."  Id.

A decision from a Texas Court of Appeals also is instructive.  See TIG Ins. Co. v. San Antonio YMCA, 172 S.W.3d 652, 662 (Tex. Ct. App. 2005).  In that declaratory judgment action, the issue was whether a sexual abuse occurrence coverage endorsement obligated an insurer to defend the insured (i.e., the YMCA) in several lawsuits which alleged that children who had attended a YMCA camp had been "'physically, sexually, and mentally abused'" by a YMCA employee and had "'suffered physical abuse.'"  Id.

22

at 662.  The YMCA argued that the complaint "alleged physical assault separate from any allegations relating to sexual abuse."  Id.  The YMCA, thus, contended that there was a "'possibility' that . . . any liability on its part for [the employee's] physical assault of the children is covered by the policy," meaning that the insurer had a duty defend for an "occurrence" which did not involve sexual abuse.  Id.  The Texas court of appeals agreed. It concluded that the "allegations suggest the possibility that the children's injuries may have resulted from physical abuse unassociated with sexual abuse or molestation. Therefore, the allegations in the plaintiffs' petitions state a cause of action potentially covered by the policy; thus, triggering [the insurer's] duty to defend in these lawsuits." Id.  In a footnote, the Texas court of appeals also rejected the insurer's argument that there was "no distinction between physical and sexual abuse."  Id. at 663 n.3.

The court finds that Guideone, as well as San Antonio YMCA, provides sufficient guidance to permit the court to predict how Alabama courts would resolve issue of the interrelatedness between the rape injuries and other alleged physical injuries.

Western World's position in this lawsuit is based upon the premise that all of the injuries suffered by Ms. Nichols on October 9, 2003, are the result of a "sexual assault" and are not divisible, but the court finds that the allegations in the underlying third amended complaint are insufficient to establish the inferences necessary to rule in favor of no coverage.  The court agrees with Western World only to the extent that, as found above, the vaginal tears suffered by Ms. Nichols as a result of the rape constitute "sexual action" and are non-covered injuries.  Cf. Guideone, 420 F.3d at 1328 (concluding that

23

"non-covered injuries [arising from sexual misconduct] could include any . . . genital bruising").  The court, however, cannot reach the same finding as to the other physical injuries for at least two reasons.

First, the black eyes and bruising on the arms and legs are not the type of injuries listed in Guideone as injuries which can be categorized as the sole result of a rape.  See id.  As in Guideone, the court cannot rule out the possibility that Ms. Nichols could have been beaten physically, without being raped, and suffered the same physical injuries to her arms, legs and eyes.  The court, thus, cannot say that the arguably non-sexual acts would not have occurred "but for" the rape.  See id.  Comparison of the facts to San Antonio YMCA leads to the same conclusion, as it certainly is plausible, based on the facts alleged, that a jury could conclude that the physical injuries suffered by Ms. Nichols to her eyes, arms and legs were not connected to the rape.

Second, there are not any facts which reveal whether all the foregoing physical injuries concurred concomitantly with the rape or were integral to the rape.  It could have been, but the facts in the underlying complaint do not reveal, for example, that Sheppard first physically assaulted Ms. Nichols, injuring her arms, legs, and eyes, and at a point later in time during the early morning hours of October 9, 2003 raped her, causing the vaginal tears.  However, in any event, as made clear in Guideone, even overlapping temporal and spatial proximity is not necessarily determinative of whether arguably non-sexual injuries "arise from" the sexual action.  There was at least room for debate in Guideone as to whether the physical assault on the back of the victim's head was

24

inseparably intertwined with the concurrent act of oral sex which the abductor forced the victim to perform.[8] Guideone, 420 F.3d at 1329 ("the Victim's injuries from assaults and batteries occurring during the course of sexual acts may or may not be intertwined with the sexual misconduct, depending upon the perpetrator's purpose").  In other words, the court cannot find that the battering of other parts of Ms. Nichols' body is so inextricably intertwined with, and thus inseparable from, the actual rape so as to be excluded from coverage by virtue of the sexual action exclusion.

Accordingly, the court finds that the facts alleged in the underlying third amended complaint simply are too scant and leave too many questions unanswered for the court to conclude, as a matter of law, that the other physical injuries to Ms. Nichols' eyes, arms and legs arose from the rape.  (See 3rd Am. Compl. ¶¶ 24, 25, 142(2).)  Thus, those counts in the complaint which arguably give rise to coverage under the policy are those counts which seek relief for the physical injuries to Ms. Nichols' arms, legs and eyes, and not for the rape injuries (i.e., the vaginal tears); these counts are 1, 4, 6, 8, 10, 12, 14, 16, 18 and 34.

---

[8] The court notes that, although Resurrection did not cite any authority in its one-and-a-half-page response to the pending motion for summary judgment, Guideone lends some support to Resurrection's theory that the perpetrator's purpose cannot be ignored.

### 5. Severability of Claims

The court agrees with Western World that all causes of action in the underlying state court complaint which arise from "sexual action," whether those causes of action are predicated on theories of negligence or breach of contract, are barred by the sexual action exclusion.  (See, e.g., Doc. No. 46.)  The exclusion itself expressly includes within its parameters damages which are alleged to have been caused by the negligence of the insured.  (See Policy at 22 (Ex. to Doc. No. 35 (providing that the sexual action exclusion "applies even if an alleged cause of the damages was the insured's negligent hiring, placement, training, supervision, act, error or omission").)  Even if the exclusion did not expressly extend to negligent causes, the opinion in Auto-Owners Insurance Co. v. American Cent. Insurance Co., 739 So. 2d 1078, 1082 (Ala. 1999) ("Auto-Owners"),which involved application of an exclusion in a homeowner's policy for injuries "[a]rising out of . . . physical or mental abuse," id. at 1080, provides authority for a finding that damages arising from "sexual action," no matter how couched in the complaint in terms of theories of liability, are interdependent and not severable.[9]

The court, however, as stated in the previous section, finds that not all of the damages arise from sexual action; these damages are severable from those damages arising from "sexual action."  Claims predicated on damages arising from the arguable non-sexual acts are covered under the policy.  The court finds that Auto-Owners, supra,

---

[9] Although Auto-Owners involved application of an intentional act exclusion, rather than a sexual molestation exclusion, the court agrees with Western World that the opinion is helpful.

does not dictate a contrary result because in that case there was no question but that all of "[t]he acts of hazing . . . clearly constituted physical and mental abuse." Id. at 1081.  As a result, the court held that, although some of the claims in the complaint alleged unintentional conduct, those claims were not severable from the claims alleging intentional conduct for the reason that all claims arose from the same facts of hazing.  See id. at 1082; Cf. State Auto Prop. and Cas. Ins. Co. v. Calhoun, No. 2:05cv122-F, 2005 WL 2406055, *6 (M.D. Ala. Sept. 29, 2005) (reasoning that negligence claims which "are based on the same underlying facts as the claims of intentional conduct . . . are not severable" for purposes of applying an exclusion for damage "expected or intended by the insured") (citing Auto-Owners, 739 So.2d at 1081).  The opinions relied upon by Auto-Owners in reaching its holding provide further illustration; in each of those opinions, every allegation arose from the excluded conduct.  See 739 So.2d at 1082.  For instance in Commercial Union Insurance Cos. v. Sky, Inc., which applied an insurance exclusion to bar coverage, the court reasoned that, "without the underlying sexual harassment claim there would have been . . . no basis for a suit . . . for imprisonment, defamation, outrage or negligent supervision."  810 F. Supp. 249, 255 (W. D. Ark 1992).  Here, to the contrary, a possibility exists that, without the rape, there still would be a basis for recovery for the damages incurred by Ms. Nichols when she suffered physical injuries to her eyes, legs and arms.  These injuries may have resulted, even absent the rape.

*6. Duty to Defend*

In the context of Western World's duty to defend, the foregoing analysis translates into a finding that Western World is not released from its obligation to defend Resurrection in the underlying state court action.  Because the underlying state court complaint presents the possibility that Ms. Nichols' damages arising from the physical injuries to her eyes, arms and legs may have resulted from physical abuse unconnected to the rape, Western World's duty to defend under the policy is triggered, without regard to the sexual action exclusion.

This potential for liability apparent on the face of the underlying third amended complaint triggers Western World's duty to defend.  See Ajdarodini v. State Auto Mutual Ins. Co., 628 So.2d 312, 313 (Ala. 1993).  For purposes of the duty to defend, it matters not, if ultimately, Resurrection is found not liable.  See Chandler, 585 So.2d at 1367 ("If the allegations of the injured party's complaint show an accident or occurrence which comes within the coverage of the policy, the insurer is obligated to defend regardless of the ultimate liability of the insured."); Blackburn, 667 So.2d at 668 ("The insurer's duty to defend is determined by the allegations of the complaint against the insured, whether true or groundless.").

*7. Duty to Indemnify*

As stated, an insurer's duty to indemnify is distinct from its duty to defend.  The duty to indemnify can only be determined by actual facts.  There is no duty to indemnify

28

as to the claims brought against Resurrection for damages arising from the rape (i.e., the vaginal tears).  As to the other damages discussed herein, however, the actual facts are not appropriate for resolution in this case, but are for determination in the underlying state court action; therefore, Alabama courts have concluded that the duty to indemnify is not ripe for consideration until and unless the insured is found liable in the underlying suit.  See Hartford Cas. Ins. Co. v. Merchants & Farmers Bank, 928 So.2d 1006, 1013 (Ala. 2005); Townsend Ford, Inc. v. Auto-Owners Ins. Co., 656 So.2d 360, 364 (Ala. 1995); see also State Farm Fire & Cas. Co. v. Middleton, 65 F. Supp.2d 1240,  (M.D. Ala. 1999) (DeMent, J.) (issue of duty to defend ripe, but duty to indemnify issue not sufficiently ripe to present case or controversy).  Because Western World's claim seeking a determination of the issue of indemnification as to the injuries suffered by Ms. Nichols to her eyes, arms and legs does not appear to be ripe for consideration at this time, the court shall direct Western World to show cause why this claim should not be dismissed without prejudice.  See, e.g., Calhoun, No. 2:05cv122-F, 2005 WL 2406055, *8.


## C.  Sexual Molestation Coverage

Because the sexual action exclusion clearly excludes coverage in the underlying litigation for damages arising from the rape, as set forth in Counts 2, 5, 7, 9, 11, 13, 15, 17, 19 and 35, the court must ascertain the limits of coverage provided pursuant to the sexual molestation coverage endorsement.  (See Sexual Molestation Insurance, Policy at 15 (Ex. to Doc. No. 35) (defining "molestation" as "any action with sexual connotation

or purpose resulting in bodily or mental injury").)  As to the coverage afforded under the sexual molestation insurance, Western World and Nichols differ over how the "Separation of Insureds" clause in the policy affects the "Limits of Insurance" provision set out in the sexual molestation insurance (Coverage E).

The "Separation of Insureds" clause of the policy provides as follows:  "Except with respect to the Limits of Insurance, . . . this insurance applies:  a.  As if each Named Insured were the only Named Insured; and b.  Separately to each insured against whom claim is made or 'suit' is brought."  (Id. at 52.)  The schedule for the sexual molestation insurance (Coverage E) quotes the "Limits of Insurance" as follows:  "Each claim $100,000[;] Aggregate  $300,000."  (Id. at 14.)  Section III of the policy, titled "Limits of Insurance," provides, in pertinent part, that the policy limits are "the most we will pay regardless of the number of . . . [i]nsureds" or "[c]laims made or 'suits' brought."  (Id. at 50.)  Specific to Coverage E, the sexual molestation insurance provides that the following additions are made with respect to "Limits of Insurance" section:  "The Each Claim limit shown in the schedule of Coverage E is the most we will pay for each claim or suit for damages due to 'molestation.'  The Aggregate Limit shown in the schedule of Coverage E is the most we will pay because of all damages due to 'molestation.'"  (Id. at 15, 50.)

Western World maintains that the "Limits of Insurance" provision in the sexual molestation insurance applies "to all of the insureds as one group as opposed to separate policy limits for each insured."  (Doc. No. 11 at 34.)  In other words, it contends that

30

"[t]he operation of the Separation of Insureds provision treats each insured as though they were covered under separate policies except for the limits of insurance." (Id. at 11 (emphasis added).)  Thus, Western World contends that, "while Nichols may chose [sic] to sue other insureds under the subject policy, the total indemnity for the claims against the insureds as a group could not exceed the policy limits of $100,000.  Thus, the limits of the coverage under the sexual molestation insurance is $100,00 regardless of the number of insured defendants, subject to a $300,000 aggregate limit.  (Doc. No. 34 at 11.)

Mr. Nichols, on the other hand, argues that, assuming but not conceding that the sexual molestation insurance governs, "each claim," as used in the "Limits of Insurance," means "each claim" in the underlying third amended complaint.  (Doc. No. 42 at 59.)  In turn, he contends that the $300,000 aggregate means that Western World would "have to pay no more than $100,000 each on only three of the claims if verdicts are returned totaling over $100,000 on separate claims." (Id.)  Nichols states further that, "[i]f it had been the intent of Western World to apply the limits to all insureds as one group the insurance company could have easily worded the policy to read as follows:  "The Each Claim limit shown in the schedule of Coverage E is the most we will pay for all claims or suits for damages due to an act of molestation."  (Doc. No. 42 at 59.)  Nichols contends that, pursuant to Western World's argument, it would "never-ever be exposed to pay the $300,00 aggregate limit." (Id.)

The crux of each parties' position is as follows.  Western World contends that for purposes of the sexual molestation insurance, all of the causes of action in the underlying state court complaint for damages arising from sexual action constitute but one "claim" under Coverage E, notwithstanding that more than one insured has been sued, for which the policy limit is $100,000.  Mr. Nichols, on the other hand, argues that the $100,000 "each claim" limit means each count, thus, raising the liability of Western World in this case to the $300,000 limit of aggregate liability.  The parties, thus, disagree, first, as to what constitutes a "claim" under the sexual molestation insurance for purposes of ascertaining the limits of insurance.  Second, the parties dispute whether the naming of multiple insured-defendants in the state court complaint (i.e., Resurrection, Johnson and Williams) affects the aggregate limits of liability under the policy.

### 1. What is a "claim"?

Western World contends that the allegations asserted in the underlying complaint constitute "one lawsuit or claim."  (Doc. No. 34 at 11.)  "Suit" is defined in the policy, but "claim" is not.  (See Policy at 55 (Ex. B to Doc. No. 35).)  Mr. Nichols does not take issue with Western World's construction of "suit," but instead asserts that there are multiple claims in the lawsuit such that it cannot be said that there is one "claim."  As

stated, Mr. Nichols contends that each count of the underlying third amended complaint

constitutes a claim.  For the reasons to follow, the court disagrees with Nichols.[10]

Neither the sexual molestation insurance nor any other section of the policy

defines the term "claim."  The court observes that this policy is not alone in its failure to

define "claim."  See Musmeci v. Schwegmann Giant Super Markets, Inc., 332 F.3d 339

(5th Cir. 2003); Colbert County Hosp. Bd. v. Bellefonte Ins. Co., 725 F.2d 651 (11th Cir.

1984); Maxim Manufacturing Corp. v. Alliance General Ins. Co., 911 F. Supp. 239 (S.D.

Miss. 1995); St. Paul Fire & Mar. Ins. Co., v. Hawaiian Ins. & Guar. Co., 637 P.2d 1146

(Ct. App. Haw. 1981).  Although Mr. Nichols generally "remind[s]" the court that

ambiguities in insurance policies are construed in favor of the insured (see Doc. No. 42

at 60), he has not expressly argued that the absence of the definition of the term "claim"

creates an ambiguity.  The court observes that, as stated in Musmeci, "[t]he absence of an

express definition does not automatically render a policy term ambiguous."  323 F.3d

at 352.

Although the court did not find a published decision from an Alabama court

involving the definition of a "claim" in a policy's limits of insurance clause, and the

parties have cited none, the Eleventh Circuit, applying Alabama law, has examined

whether there existed a single or multiple "claims" for purposes of the aggregate policy

limits.  In Colbert County Hospital, on an appeal from a judgment of an Alabama district

---

[10] The court notes that Nichols has not cited any authority in support of his position
that "each claim" is synonymous with "each count" in a legal complaint, and the court is
aware of none.

court, the Eleventh Circuit considered whether the "each claim" limit in a professional

liability insurance policy was triggered once or three times by a lawsuit filed by a former

patient treated at the hospital.[11]  See 725 F.2d at 651.  The policy in Colbert, similar to

the policy at issue in this case, contained a limits of liability clause, stating "100 thousand

dollars each claim.  300 thousand dollars aggregate," id. at 653, and provided that,

regardless of the number of insureds, the limits of liability on "each claim" was "the limit

of the company's liability for all damages because of each claim or suit covered hereby.

The limit of liability stated in the schedule as 'aggregate' [was], subject to the above

provision respecting 'each claim,' the total limit of the company's liability hereunder for

all damages."  Id.

In that case, the facts revealed that the patient underwent three different operations

for the removal of fat.  The three surgeries were performed at the same hospital and by

the same doctor, but on three separate occasions, and the surgeries resulted in scarring in

three different locations on the plaintiff's body.  The insurer argued that the term "claim"

in the limits of liability clause meant a single lawsuit or a single lawsuit filed by a single

plaintiff and, therefore, that the plaintiff had asserted a single "claim" under the policy

because she brought only one lawsuit.  See id. at 653.  Rejecting the insurer's argument,

the Eleventh Circuit emphasized that the policy used the terms "claim" and "suit" in the

disjunctive, not the conjunctive, indicating that the terms had distinct meanings.  Id.

---

[11] Although Colbert dealt with a malpractice insurance policy, rather than a
commercial general liability policy, the court finds that Colbert is instructive.

at 653.  Although the court did not provide a precise definition of "claim," finding it unnecessary to do so on the facts provided, it applied a common usage of the word "claim."  Id. at 653.  The Colbert court held that, because the plaintiff's complaint alleged three "separate and distinct claims," seeking damages for "separate injuries from each admission" to the hospital, the plaintiff had three separate "claims" against the insured. Id.  The court observed that its conclusion was "consistent with the only authority on point that the parties found."  Id. (citing St. Paul Fire & Mar. Ins. Co. v. Hawaiian Ins. & Guar. Co., 637 P.2d 1146 (Ct. App. Haw. 1981)).

Although Colbert is distinguishable on its facts, the court finds that it provides guidance as to whether in this case Mr. Nichols has presented a "claim" or "claims" regarding the injuries which the court has ascertained are directly attributable to the rape (i.e., the vaginal tears).[12]  First, the time line of the injuries was considered by the Colbert court.  In Colbert, the injuries were sustained as a result of different surgeries performed on different days.  To the contrary, here, the rape injuries sustained by Ms. Nichols occurred during the same tragic event in the early morning hours of October 9, 2003.

Second, in Colbert each injury was severable and discrete from the next; each injury resulted from a different surgery performed on a different part of the plaintiff's body.  Here, the rape injuries did not occur on separate occasions, but rather were the result of a single incident.  Third, contrary to Colbert, Ms. Nichols' causes of action,

---

[12] Henceforth, the court refers to these injuries as the "rape injuries."

35

seeking relief for the rape injuries, are not subject to separate lawsuits.  Accordingly, the court finds that the rape injuries constitute a single "claim."

The court discerns from Colbert that the definition of "claim" does not turn on the number of counts asserted in the legal complaint, but rather on the origin of the damages. The court reaches the same conclusion when it interprets the words "each claim" according to their ordinary meaning.  See H & H Stephens Const., Inc., ___ So.2d at ___, 2006 WL 749992, *4 ("[T]erms of an insurance policy should be given a rational and practical construction."); McKissick, 429 So.2d at 1033 ("provisions of insurance policies must be construed in light of the interpretation that ordinary [people] would place on the language used").  Namely, the "each claim" provision in the "Limits of Insurance" in the sexual molestation insurance is formulated by reference to the "damages due to 'molestation,'" rather than to the number of claims asserted.  The drafting of the policy does not rely upon the number of claims asserted.

In short, the court determines that it is not appropriate to determine the number of "claims" by reference to the number of counts in the underlying stat court complaint. Accordingly, the court finds that $100,000 limit for a single claim controls, rather than the policy's $300,000 limit for aggregate claims.

The second issue, in the court's opinion, does not warrant much discussion.  Mr. Nichols has failed to read the "additions" to the Limits of Insurance, set forth in the sexual molestation insurance, in tandem with the "Limits of Insurance" set forth in the main body of the commercial general liability policy.  (See Policy at 50 (Ex. to Doc. No.

35).)  The plain wording of the policy provides that the limits of insurance are not affected by the number of insureds.  (See id. (providing that "[t]he Limits of Insurance . . . fix the most we will pay regardless of the number of . . . insureds."  (Id.)  Moreover, the severability or "Separation of Insureds" clause expressly excepts from its provision the "Limits of Insurance" section.  In other words, while the "Separation of Insureds" clause has the effect of creating separate contracts between the insurer and each insured, it does not increase the policy limits set out in the "Limits of Insurance."

    Mr. Nichols cites Silverball Amusement v. Utah Home Fire, 842 F. Supp. 1151 (W.D. Ark. 1994), aff'd, 33 F.3d 1476 (8th Cir. 1994) (per curiam), and Townsend Ford, Inc. v. Auto-Owners Ins. Co., 656 So.2d 360 (Ala. 1995), in support of his position. (Doc. No. 42 at 59-60.)  These decisions, however, are of no value in resolving this case, as neither court was confronted with an issue concerning policy limits.  Although the Silverball court quoted a "separation of insureds" clause identical to the one at issue here, explaining that the effect of the severability clause was to create separate contracts between the insurer and each insured, it did so for purposes of ruling that a commercial liability policy's exclusionary clause for the intentional acts of an insured-employee did not bar coverage of a suit against the employer as the named insured.  See id. at 1155. The limits of insurance coverage were not at issue in Silverball; thus, the court had no reason to discuss, and did not discuss, the stipulation in the severability clause which eliminated its applicability to the limits of insurance.  Similarly, Townsend Ford addressed an argument by an insured (car dealership) that, although an intentional acts

37

exclusion may bar coverage for the fraudulent acts of a car dealership's sales associates (also insureds), the exclusion did not apply to a suit against the car dealership due to the inclusion of a separation of insureds clause.  In that decision, the court concluded that under agency principles the exclusion in the policy barred coverage for the lawsuit against the car dealership because "[i]nasmuch as [the car dealership's] salespeople were acting as agents on behalf of the corporation and its business operations, their intent is the intent of the corporation."  656 So.2d at 363.  <u>Townsend Ford</u>, like <u>Silverball</u>, did not involve consideration of the limits of liability under the policy.  In short, the court finds that the fact that multiple insureds are named in the lawsuit does not increase the aggregate policy limits in the sexual molestation insurance.

## VI.  ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Western World's motion for summary judgment be and the same is hereby GRANTED to the extent that it is DECLARED and ADJUDGED that Western World is not obligated to defend or to indemnify Resurrection in the underlying state court action for all counts in the underlying state court which are predicated upon the rape injuries, except as provided in the sexual molestation insurance endorsement, and that the maximum coverage to which Resurrection is afforded under the sexual molestation insurance endorsement for "each claim" or "suit" is $100,000.  The motion for summary judgment otherwise is DENIED.

It is further CONSIDERED and ORDERED that on or before August 8, 2006, the parties show cause (1) why final judgment should not be entered on the declaratory judgment action, partially in favor of Plaintiff and partially in favor of Defendants, consistent with the rulings herein, as this Memorandum Opinion and Order addresses all issues raised in this declaratory judgment action; (2) why, in light of the findings rendered herein, Resurrection's counterclaim should not be dismissed as moot; and (3) why Western World's claim seeking a declaration on indemnification pertaining to Ms. Nichols' claims for damages arising from the physical injuries to her eyes, arms and legs should not be dismissed without prejudice on ripeness grounds.

Done this 25th day of July, 2006.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE